UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WARRIOR ENERGY SERVICES                    CIVIL ACTION
CORPORATION ET AL.


VERSUS                                     NO: 12-2297


ATP TITAN, *in rem*, AND ATP               SECTION: R
TITAN, LLC, *in personam*

**ORDER AND REASONS**

Before the Court is defendants' motion to dismiss for lack
of jurisdiction.[1] Also before the Court are plaintiffs' motions
to deem *in rem* jurisdiction perfected[2] or, in the alternative, to
issue a warrant for arrest[3] and to appoint a consent guardian.[4]
For the following reasons, the Court grants defendants' motion to
dismiss and denies plaintiffs' motions as moot.


**I.    BACKGROUND**

This dispute stems from fees allegedly owed to plaintiffs
for tools and services provided to the ATP TITAN, a floating
production facility moored approximately 65 miles offshore of
Louisiana in a production field owned by ATP Oil and Gas. Six
plaintiffs, Warrior Energy Services Corporation, Fastorq LLC;

---

[1]    R. Doc. 16.

[2]    R. Doc. 12.

[3]    R. Doc. 5.

[4]    R. Doc. 6.

Stabil Drill Specialties LLC, Workstrings International LLC, and Superior Energy Services, LLC d/b/a Superior Completion Services, contend that they provided supplies and services to the ATP TITAN, the costs of which have not been paid by ATP Titan, a limited liability company that owns the platform.[5] Plaintiffs filed suit on September 17, 2012, asserting maritime liens against the ATP TITAN and state law privileges in the alternative against ATP Titan, *in personam*, and the ATP TITAN, *in rem*.[6] Plaintiffs do not assert claims against ATP Oil and Gas, the company that operates the platform and contracted with plaintiffs for supplies and services. ATP Oil and Gas is presently in bankruptcy proceedings. Plaintiffs also seek a declaratory judgment that the ATP TITAN is a vessel and that they have valid liens in the amount of $2,189,424.86, in addition to pre-judgment and post-judgment interest.[7]

Defendants filed a motion to dismiss for lack of jurisdiction on the grounds that the ATP TITAN is not a vessel but a floating production platform, thus depriving the Court of *in rem* jurisdiction over the ATP TITAN.[8] The parties then moved for an extension of deadlines to permit plaintiffs to conduct

---

[5]    R. Doc. 1.

[6]    R. Doc. 1 at 8.

[7]    *Id*. at 9.

[8]    R. Doc. 16.

limited jurisdictional discovery on the issue of whether the ATP TITAN is a vessel.[9] The Court heard oral argument on defendants' motion to dismiss on March 26, 2013.

## II.   *IN REM* JURISDICTION

### A. Standard

The first issue before the Court is whether the ATP TITAN is a vessel. Unless it is, plaintiffs have no maritime liens for the provision of necessaries to the ATP TITAN, and seizure of the ATP TITAN is not a basis for maritime *in rem* jurisdiction. Under 46 U.S.C.A. § 31342(a), "a person providing necessaries to a vessel on the owner's order or on the order of an authorized person . . . has a maritime lien on the vessel." Further, Rule C of the Supplemental Rules for Admiralty and Maritime Claims provides that an action *in rem* may be brought to enforce a maritime lien by the arrest of a vessel. Fed. R. Civ. P. Supp. R. C(1)(a). Therefore, absent vessel status, plaintiffs have no maritime claims against the ATP TITAN that can support the exercise of *in rem* jurisdiction in admiralty. *See Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.*, 346 F.3d 552, 556 (5th Cir. 2003) ("Non-maritime claims are not within admiralty jurisdiction and may not be enforced in an *in rem* proceeding."); *Maritrend, Inc. v. M/V Sebes*, No. 96-3140, 1997 WL 660614, at *2 (E.D. La. Oct.

---

[9]     R. Doc. 19.

3

23, 1997). (Maritime Lien Act permits civil action against vessel based on "fiction that the vessel is a distinct entity that is statutorily liable for its own debts").

**B.   Characteristics of the ATP TITAN**

The ATP TITAN is a triple-column, deep-draft, floating production facility.[10] It is moored in over 4000 feet of water in a production field owned by ATP Oil and Gas.[11] The ATP TITAN serves as a production hub for the fields nearby, and several wells are connected by top-tensioned production risers and surface trees at the surface of the facility.[12] In November 2009, the ATP TITAN was floated out and wet towed on its side and was fully installed by March 2010.[13] Its hull floats at a draft of 430 feet on three columns.[14] The ATP TITAN has features such as a wave-rider hull, navigational lights, life boats, crew quarters, and an onboard generator and drinking-water plant.[15] It also has hydrocarbon processing equipment to separate oil, gas and water, pumps to transport oil production into an oil export line, and

---

[10]   R. Doc. 16-2 at 2.

[11]   *Id.* at 1-2.

[12]   *Id.* at 2

[13]   R. Doc. 16-2 at 3.

[14]   *Id.* at 2.

[15]   R. Doc. 26-33 at 21-25.

4

gas compressors to transport gas production.[16] At one time, the ATP TITAN had aboard the Nabors 202 drilling rig, owned by a third party.[17] The ATP TITAN is classified by the American Bureau of Shipping as an "A1 Floating Offshore Installation" and as an "Industrial Vessel" by the Coast Guard, which performs inspections of the structure.[18] The design of the ATP TITAN is subject to a patent in which the structure is described as "a deep draft partially submersible and buoyant floating vessel comprised of at least three independent vertical columns."[19]

Although it is buoyant, the ATP TITAN is securely moored to the floor of the Outer Continental Shelf by twelve moorings connected to mooring piles that are embedded over 205 feet into the sea floor and weigh over 170 tons each.[20] The structure is also stabilized by flowlines, umbilicals, and pipeline systems.[21] It has no means of self-propulsion but can reposition itself over wells by manipulating its mooring lines.[22] The ATP TITAN has not been moved since 2010, and ATP Oil and Gas states that it will

---

[16]   R. Doc. 16

[17]   R. Doc. 30-1 at 17.

[18]   *Id*. at 9; R. Doc 30-5 at 3.

[19]   R. Doc. 26-14.

[20]   R. Doc. 16-2 at 3.

[21]   *Id* at 4.

[22]   *Id.*; R. Doc. 30-12.

5

not be moved until the surrounding fields are no longer productive, estimated to be in five to eight years.[23] The structure has an expected life of roughly 40 years.[24] To move the ATP TITAN to a new location will take approximately 15-29 weeks after 12 months of preparation and will cost between $70 and $80 million.[25] Before being towed, the ATP TITAN will have to be decommissioned and its moorings, well risers, pipelines, umbilicals, and production infrastructure disconnected.[26]

**B.   Vessel status of offshore structures**

The statutory definition of a vessel includes "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. Within this general definition, courts have analyzed the vessel status of various types of offshore structures. The Fifth Circuit Court of Appeals has addressed the distinction between vessels and other facilities used in offshore oil and gas operations on more than one occasion.[27] In *Fields v.*

---

[23]   R. Doc. 16-2 at 4.

[24]   R. Doc. 26-5.

[25]   R. Doc. 16-2 at 4-5; R. Doc. 30-2 (report estimating decommissioning and redeployment costs at $ 78.5 million).

[26]   R. Doc. 16-2 at 4.

[27]   Although most of the cases concerned claims under the Jones Act, the Court finds that the analysis of whether a structure is a vessel is applicable in the context of maritime liens. *See, e.g, Crimson Yachts v. Betty Lyn II Motor Yacht*, 603

*Pool Offshore, Inc.*, for example, the Fifth Circuit set forth criteria by which to determine the vessel status of a spar, namely whether the structure was constructed to serve primarily as a work platform, is moored, and its transportation function does not go "beyond theoretical mobility and occasional incidental movement." 182 F.3d 353, 358 (5th Cir. 1999). The court held that the spar at issue, which was elaborately secured to the ocean floor, had a range of motion limited to 250 feet in any direction, and would not be moved until the field it supported was no longer productive, qualified as a work platform rather than a vessel. *Id.*

The Fifth Circuit recently revisited the issue of which offshore structures constitute vessels in *Mendez v. Anadarko Petroleum Corporation.* 466 Fed. Appx. 316, 318 (5th Cir. 2012), *cert. denied*, No. 11-1525, 2013 WL 215501 (Jan. 22, 2013). In assessing whether the Red Hawk, a floating gas-production spar, was a vessel, the Fifth Circuit relied on the Supreme Court's holding in *Stewart v. Dutra Construction Co.,* 543 U.S. 481 (2005), that a vessel is "any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." *Id.* at 318. The court found that because the Red Hawk was permanently affixed to the sea floor and could be moved only at great cost after detaching

---

F.3d 864, 872 (11th Cir. 2010).

its moorings and severing its pipelines, the spar was "theoretically capable of maritime transport but not practically capable." *Id*. at 319. Accordingly, the court held that the Red Hawk was not a vessel. *Id.* at 318-19.

The ATP TITAN and the Red Hawk share many of the same features. For example, like the ATP TITAN, the Red Hawk was identified as an industrial vessel on its Coast Guard Certificate of Inspection, which also listed the number of "seamen" on board.[28] The Coast Guard's inspection of a structure does not establish that it is a vessel, since the Coast Guard has jurisdiction to inspect Outer Continental Shelf facilities and mobile offshore drilling units, in addition to vessels.[29] Further, although the ATP TITAN has maritime design elements, such as buoyancy, life boats, navigational lights, a wave-rider hull, an onboard generator, and crew quarters, the Fifth Circuit noted in *Mendez* that the shape of the Red Hawk's hull could facilitate movement, *id*. at 317; and the district court noted maritime features such as life boats, No. CIV.A. H-10-1755, 2010 WL 4644049, at *3 (S.D. Tex. Nov. 9, 2010). Both courts found that such characteristics were "consistent with a fixed structure permanently moored far offshore, not merely with vessel status." 466 Fed. Appx. 316, 317; 2010 WL 4644049, at *3. The Court

[28]    R. Doc. 30-5 at 1, 3.

[29]    R. Doc. 30-10 at 2.

8

similarly finds that these features of the ATP TITAN do not require a determination that it is a vessel. Rather, these characteristics reflect the platform's inaccessibility and need for self-sufficiency, as well as its position in thousands of feet of water.

The ATP TITAN does differ from the Red Hawk in its ability to move laterally and in its design. The Red Hawk could not move laterally because its mooring lines were permanently taut. *Mendez*, 466 Appx. at 317. Conversely, the ATP TITAN can reposition itself over the wells it sits on up to 200 feet from its center location by using its anchor lines, although the ATP TITAN has never been repositioned more than 130 feet.[30]  Further, the ATP TITAN has been described as a "first-of-its-kind floating drilling and production platform that combines the mobility of a semi-submersible with the stability of a three-column spar."[31] It is considered a hybrid semi-submersible/spar.[32] Semi-submersible drilling rigs are generally considered vessels, unlike production platforms or spars. *See, e.g., Case v. Omega Natchiqu, Inc.*, H-08-0835, 2008 WL 2714124 (S.D. Tex. July 10, 2008) (holding ATP Innovator, previously a semi-submersible drilling rig, to be a non-vessel once it was moored indefinitely).

---

[30]   R. Doc. 30-12.

[31]   R. Doc. 26-6 at 1.

[32]   R. Doc. 16-2 at 2.

9

In considering the effect of the ATP TITAN's status as a hybrid semi-submersible/spar, the Court first rejects the notion that the structure qualifies as a semi-submersible drilling rig or modular offshore drilling unit. Although the ATP TITAN has been involved in drilling activities, it does not have a built-in capacity to drill but rather served as a platform for a drilling rig at one time.[33] That it once had a modular drilling rig, the Nabors 202, aboard does not convert the entire ATP TITAN into a semi-submersible drilling rig and therefore a vessel. Moreover, in characterizing drilling rigs as vessels, the Fifth Circuit has emphasized the use of the rigs on many different sites in a short period rather than their drilling functions. *See, e.g., Manuel v. P.A.W. Drilling & Well Serv*., Inc., 125 F.3d 344 (5th Cir. 1998) (rig that worked in 19 locations in two years was a vessel); *Blanchard v. Engine & Gas Compressor Svcs. Inc*., 575 F.2d 1140, 1143 (5th Cir. 1978) (structure not a vessel that had been moved from another site but was secured in a way that suggested it would not be moved on a regular basis like a rig).

Therefore, the relevant inquiry is not whether the ATP TITAN has drilled but whether its capacity for movement distinguishes it from the Red Hawk and other structures designated as spars. In *Stewart v. Dutra*, which the Fifth Circuit relied on in *Mendez*, the Supreme Court held that a non-self-propelled dredge Super

---

[33]    R. Doc. 30-4 at 38.

Scoop was a vessel. 543 U.S. 481 (2005). The Super Scoop was a floating platform from which a bucket was suspended beneath the water to remove silt from the ocean floor. It had a captain, crew, and navigational lights. *Id.* at 484-85. Using a limited means of self-propulsion through its anchors and cables, the structure moved over water "every couple of hours." *Id.* at 485. The Super Scoop was towed by tugboat for longer distances and was towed from California to Boston to work on the project at issue. *Id.* As discussed above, the Supreme Court held that a watercraft need not be used primarily for transportation on water to be a vessel, but its use in this area must be a practical possibility rather than a merely theoretical one. *Id.* at 496. The Court stated that "dredges served a waterborne transportation function, since in performing their work they carried machinery, equipment, and crew over water." *Id.* at 492. The Super Scoop was stationary only temporarily and was not permanently anchored during its work in Boston Harbor. *Id.* at 496.

By contrast, the ATP TITAN is moored to the floor of the Outer Continental Shelf by twelve moorings, each of which is embedded 205 feet into the sea floor and weighs over 170 tons.[34] Further, oil and gas are exported from the ATP TITAN through pipelines, which also stabilize the structure.[35] The ATP TITAN

---

[34]   R. Doc. 16-2 at 3.

[35]   *Id.* at 4; R. Doc. 30-12.

has no self-propulsion system, despite its ability to move laterally using its mooring lines.[36] The ATP TITAN is designed to be floated to its next location,[37] and defendants estimate that it will be relocated in five to eight years when the fields it supports are exhausted. This endeavor will take approximately 15-29 weeks after 12 months of preparation and will cost between $70 and $80 million.[38] Conversely, the estimate of moving the Red Hawk, which its owners did not undertake, was only $42 million. *Mendez*, 466 Appx at 317.

Despite the structure's design allowing it to shift laterally and to be moved, the Court finds that the ATP TITAN does not serve a waterborne transportation function in any practical sense. The dredge at issue in Super Scoop was moved much more frequently and easily. That the ATP TITAN *can* be moved does not qualify it as a vessel, given the enormous expense associated with its relocation and the extent to which it is securely attached to the floor of the Outer Continental Shelf in its role as a production facility. Further, there is no evidence that the ATP TITAN frequently uses its mooring lines to shift itself, and in any event, the Fifth Circuit held in *Fields* that

---

[36]   *Id*. at 4; R. Doc. 30-12.

[37]   R. Doc. 30-1 at 14.

[38]   R. Doc. 16-2 at 4-5; R. Doc. 30-2 (report estimating decommissioning and redeployment costs at $ 78.5 million).

12

the spar at issue was not a vessel, despite its ability to move up to 250 feet by tightening and slackening its lines. 182 F.3d at 359; *see also Richardson v. Kerr-McGee Oil & Gas Corp.*, No. 08-1074, 2011 WL 2565315, at *3 (E.D. La. June 28, 2011) (holding that *Stewart* did not vitiate the test set forth in *Fields*, since a platform's ability to move 250 feet in the middle of the ocean does not constitute transportation). Thus, the ATP TITAN resembles much more closely the spars previously found by courts in this circuit to be non-vessels than it does the Super Scoop dredge.[39] *See, e.g., Mendez,* 466 Fed. Appx. at 318-19; *Fields*, 182 F.3d at 358; *Channel v. Grand Isle Shipyard, Inc.,* No. 01-682, 2001 WL 515220 (E.D. La. May 14, 2001) (spar designed to act as work platform not a vessel).

   C.   **Impact of *Lozman v. City of Riviera***

   Plaintiffs question the precedential value of the Fifth Circuit cases cited here in light of the recent Supreme Court case, *Lozman v. City of Riviera Beach, Fla.*, 133 S. Ct. 735 (2013). In *Lozman*, the Supreme Court reversed the Eleventh Circuit's holding that a floating home constituted a vessel, stating that "a structure does not fall within the scope of this statutory phrase unless a reasonable observer, looking to the [structure]'s physical characteristics and activities, would

---

      [39]   *See* R. Doc. 28-8 (chart comparing the features of the ATP TITAN to other structures held not to be vessels by courts within the Fifth Circuit).

consider it designed to a practical degree for carrying people or things over water." *Id.* at 741. Defendants argue that the *Lozman* decision is inapplicable here given the clear precedent of the Fifth Circuit, since the Supreme Court stated that its decision would assist courts in "borderline cases where 'capacity' to transport over water is in doubt." *Id.* at 745.  In any event, the Court finds that the holding of *Lozman* supports its conclusion that the ATP TITAN is not a vessel.

In holding that the floating home did not qualify as a vessel, the Court emphasized that a vessel must be practically, not just theoretically, capable of carrying people or things over water. *Id.* at 741. In considering the characteristics of the floating home, the Court stated:

> But for the fact that it floats, nothing about Lozman's home suggests that it was designed to any practical degree to transport persons or things over water. It had no rudder or other steering mechanism. Its hull was unraked, and it had a rectangular bottom 10 inches below the water . . . . Prior to its arrest, that home's travel by tow over water took place on only four occasions over a period of seven years. And when the home was towed a significant distance in 2006, the towing company had a second boat follow behind to prevent the home from swinging dangerously from side to side.

*Id.* at 741 (citations omitted).

The ATP TITAN has not moved locations since it was fully installed in March 2010, and its eventual relocation will require

a massive expenditure of money and manpower.[40] It is true that the Court in *Lozman* cited the lateral movement of the Super Scoop in distinguishing the floating home's capacity for movement. *Id.* at 742. Yet, not only was the Super Scoop much more mobile that the ATP TITAN in moving from site to site, but it also moved around on its moorings every few hours, activity noted by the Court in *Lozman. Id.* (quoting *Stewart*, 543 U.S. at 485). Conversely, there is no evidence in the record that the ATP TITAN makes such frequent use of its mooring lines to reposition itself over the wells on which it sits.

Further, the *Lozman* decision reflects the Supreme Court's rejection of the "anything that floats" approach in an effort to cabin the definition of a vessel. *See Mooney v. W & T Offshore*, No. 12-969, 2013 WL 828308, at *4 (E.D. La. March 6, 2013) (quoting *Fireman's Fund Ins. Co. v. Great. Am. Ins. Co. of N.Y.*, No. 10-1653, 2013 WL 311084, at *3 (S.D.N.Y. Jan. 25, 2013)("*Lozman* sent a shot across the bow' of those lower courts whose opinions [could] be read as endorsing the anything floats approach to determining vessel status."). For this reason, the Court finds it to be unlikely that the Supreme Court's opinion would have the effect of invalidating Fifth Circuit precedent establishing that floating production platforms are not vessels. The Fifth Circuit opinion that the Supreme Court criticized as

---

[40]    R. Doc. 16-2 at 4.

endorsing an inappropriate approach is *Holmes v. Atlantic Sounding Company,* 437 F.3d 441 (5th Cir. 2006), in which the Fifth Circuit held that a barge that housed workers *was* a vessel. 133 S. Ct. at 743. Moreover, after issuing its decision in *Lozman*, the Supreme Court denied *certiorari* to the appellant in *Mendez v. Anadarko Petroleum Corporation*, discussed *supra*, who sought to overturn the Fifth Circuit's determination that the Red Hawk was not a vessel. 133 S.Ct. 979 (Jan. 22, 2013). The denial of the writ does not establish the Supreme Court's endorsement of the holding in *Mendez*. Nevertheless, it is worth noting since the Supreme Court, that same day, cited *Lozman* in vacating a judgment concerning the vessel status of a casino boat. 133 S.Ct 979 (Jan. 22, 2013) (remanding *Lemelle v. St. Charles Gaming Company, Inc.*, No. 11-255, 2012 WL 130351 (La. Ct. App. Jan. 4, 2012) (holding that riverboat casino was not a vessel)). The Court therefore finds that the Supreme Court has given no indication that its decision in *Lozman* disturbed Fifth Circuit precedent and analysis concerning floating platforms.

Another court in the Eastern District of Louisiana reached a similar conclusion in *Mooney v. W & T Offshore Inc*. 2013 WL 828308, at *3-5. The court cited *Stewart*, *Lozman*, and *Mendez* in holding that the Matterhorn Seastar does not qualify as a vessel. *Id.* at *5. The Matterhorn Seastar is a production platform that has been secured in the same position on the Outer Continental

16

Shelf for ten years. *Id.* Like the ATP TITAN, it is securely attached to the seafloor and is not intended to be moved, except for its positioning within the block on the Outer Continental Shelf and at the end of the life of the reservoirs it serves. The court held that its capacity to "be used in maritime transportation is nothing more than a 'theoretical possibility.'" *Id.* at *6. In analyzing the status of the Mattherhorn Seastar using the criteria set forth in *Lozman*, the court noted that its conclusion was supported by the holding of *Mendez* and other district court cases within the Fifth Circuit. *Id.*

In fact, rather than casting doubt on the ATP TITAN's non-vessel status, *Lozman* and its emphasis on the impressions of a reasonable observer reinforce the Court's determination that the ATP TITAN is not a vessel.[41] A reasonable observer, in considering the infrastructure affixing the ATP TITAN to its present location, its function as a production platform, the way in which it was brought to its current location, and the enormous expense anticipated if it is moved, would likely find that the ATP TITAN is not practically capable of carrying people or things

---

[41]    The Court rejects plaintiffs' contention that because earlier cases within the Fifth Circuit assessed structural design and thus considered in part the subjective intent of the structures' owners, the cases are no longer persuasive authority. In any event, the Court does not base its conclusion on any one such case but rather the body of precedent, in addition to the Supreme Court decisions discussed in depth.

17

over water.[42] That a manual exists detailing how the ATP TITAN
can be moved in an emergency is consistent with this
conclusion,[43] for if a structure will be moved only in an
emergency or in several years when there are no longer
surrounding activities to support, it does not serve as a means
of transportation over water. Further, defendants' relocation
manual, which discusses how the platform would be moved and
states that crew would be present during the eventual tow, is
insufficient to show that the ATP TITAN will perform marine
transport functions in any practical sense.[44]

The Court thus finds that the ATP TITAN does not qualify as
a vessel. Accordingly, plaintiffs have not met their burden in
demonstrating that the Court may exercise *in rem* admiralty
jurisdiction over the ATP TITAN. *See Lozman*, 133 S.Ct. at 745.
("A court's jurisdiction, *e.g.,* admiralty jurisdiction, may turn
on application of the term 'vessel.'").  The Maritime Lien Act,
under which a civil action may be brought against a vessel is
"premised on the fiction that the vessel is a distinct entity
that is statutorily liable for its own debts." *Maritrend, Inc. v.
M/V Sebes*, No. 96-3140, 1997 WL 660614, at *2 (E.D. La. Oct. 23,

---

[42]   *See, e.g.,* R. Docs. 26-6; 26-7; 30-3 (images depicting
the ATP TITAN's structure and the way in which it was towed to
its present location).

[43]   R. Doc. 26-23.

[44]   R. Doc. 26-22.

1997). Because plaintiffs point to no other law that would allow the Court to exercise jurisdiction over the ATP TITAN as a defendant, the Court finds that the ATP TITAN must be dismissed from the case.

## III. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AGAINST ATP TITAN, LLC

### A. Standard

When a defendant attacks the complaint because it fails to state a legally cognizable claim, Rule 12(b)(6) provides the appropriate challenge. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1960 (2009)(quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 239 (5th Cir. 2009); *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir. 1996). But the Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal,* 129 S.Ct. at 1949.

**B. Discussion**

Defendant ATP Titan, LLC does not argue that it is not subject to the Court's jurisdiction. Rather, it asserts that plaintiffs have failed to state a claim on which relief may be granted. Plaintiffs seek a declaratory judgment that the ATP TITAN is a vessel and that they have valid maritime liens against the vessel.[45] Such relief is barred by the Court's determination that the ATP TITAN is not a vessel. Further, although plaintiffs provided supplies and services to the platform, which ATP Titan, LLC owns, plaintiffs executed contracts for this work with ATP Oil and Gas, not ATP Titan, LLC.[46] In fact, during the oral argument held on March 26, 2013, plaintiffs' counsel conceded that if the Court finds that the ATP TITAN is not a vessel, plaintiffs have no remaining claims against defendants. Accordingly, the Court finds that plaintiffs have failed to state a claim against ATP Titan, LLC.

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS defendants' motion to dismiss both defendants. Because the Court has found that it cannot exercise *in rem* jurisdiction over the ATP TITAN,

---

[45]   R. Doc. 1 at 9.

[46]   R. Doc. 16-3.

20

plaintiffs' motions to deem *in rem* jurisdiction perfected and to issue an arrest warrant are moot.


   New Orleans, Louisiana, this 22nd day of April, 2013.



                        _____
                             SARAH S. VANCE

                        UNITED STATES DISTRICT JUDGE